FILED
IN OPEN COURT
OCT 14 2026
CLERK, U.S. DISTRICT COURT
NEWPORT NEWS, VA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | |
|---|---|
| UNITED STATES OF AMERICA | UNDER SEAL<br>CRIMINAL NO. 4:26CR 75 |
| v. | |
| LILLIE LOUISE LUCAS<br>(Counts 1, 2, 3, 4, 5) | 18 U.S.C. § 1962(d)<br>Racketeering Conspiracy<br>(Count 1) |
| LISA LUCAS BURKE<br>(Counts 1, 2, 3, 4, 5) | 21 U.S.C. §§ 846 and 841<br>Conspiracy to Distribute and Possess with Intent to Distribute Marijuana,<br>(Count 2) |
| PRINCE ALBERT WILLIAM HUDSON, III<br>(Counts 1, 2, 3) | 18 U.S.C. § 1956(h)<br>Conspiracy to Launder Money<br>(Count 3) |
| RYAN EICHELBERGER<br>(Counts 1, 2, 3, 5, 7) | 18 U.S.C. §§ 1349, 1343 and 1346<br>Conspiracy to Commit Honest Services Fraud<br>(Count 4) |
| THERESA LUCAS-LAMB<br>(Counts 1, 2, 3, 5) | 21 U.S.C. § 856(a)(2)<br>Maintaining a Drug Involved Premises<br>(Counts 5, 6) |
| CARLTON UPTON, JR.<br>(Counts 1, 2, 3, 4, 6, 8) | 18 U.S.C. 924(c)(1)(A)<br>Possess Firearm in Furtherance of Drug Trafficking<br>(Count 7) |
| TAMEKA JOHNSON<br>(Count 2, 3, 6) | 18 U.S.C. §§ 1343 and 2<br>Wire Fraud<br>(Count 8) |
| | 18 U.S.C. §§ 924(d), 982(a)(1);<br>21 U.S.C. § 853; 28 U.S.C. § 2461<br>Forfeiture Allegation |

## INDICTMENT

October 2026 Term – at Newport News, Virginia

At all times relevant to this indictment:

## BACKGROUND

### A. Federal Law

a. The Controlled Substances Act, Title 21, United States Code, Sections 801, et seq. (hereinafter CSA) and its implementing regulations, set forth which drugs and other substances are defined by law as "Controlled Substances." Those Controlled Substances are then assigned to one of five schedules – Schedule I, II, III, IV, or V, depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

b. The term "Schedule I" means the drug or other substance has no currently accepted medical use and cannot be safely used even under medical supervision. No prescriptions may be written for Schedule I substances.

c. The term "Schedule II" means the drug or other substance has a high potential for abuse, the drug has a currently accepted medial use with severe restrictions, and abuse of the drug may lead to severe psychological or physical abuse dependence. Certain Schedule II drugs can be crushed and snorted, or dissolved and injected, to get an immediate high. This abuse can lead to addiction, overdose, and sometimes death.

d. The term "Schedule III" means the drug or other substance has a high potential for abuse, but less than the drugs or substances listed in Schedule II, the drug has a currently accepted medical use with severe restrictions, and abuse of the drug may lead to severe psychological or physical dependence.

e. The term "Schedule IV" means the drug or other substance has a low potential for abuse relative to the drugs or substances in Schedule III, the drug has a currently accepted medical use in treatment, and abuse of the drug may lead to limited (relative to the drugs or substances in Schedule III) physical dependence or psychological dependence.

f. Under the CSA, marijuana classification is split. State licensed medical marijuana and FDA approved products are classified as Schedule III. Recreational and unlicensed marijuana is classified as Schedule I.

g. Cannabis sativa is a flowering plant that contains hundreds of compounds; the cultivation of the plant contributes to different compound concentrations. Of these, Δ9-tetrahydrocannabinol (THC) and cannabidiol (CBD) are of special relevance. THC is a psychoactive compound whose effects are the result of action on the brain's endogenous cannabinoid receptors (CB1 and CB2). Some of the psychoactive effects of THC intoxication can include (1) euphoric or "high" states of elevated mood and relaxation, (2) perceptional disturbances regarding time, color, or sound, among others, (3) cognitive impairment of short-term memory and learning, (4) anxiety or paranoia, and (5) dissociative states such as depersonalization. THC can also produce physiological effects including tachycardia, orthostatic hypotension, dry mouth, red eyes, and increased appetite. Long-term use is associated with reduced intelligence quotient (IQ) scores, schizophrenia or other psychoses, anxiety, increased risk of suicidal ideation, planning, and attempts, and cyclic vomiting syndrome; THC is also known to have adverse reproductive consequences in both males and females. THC is the active component of marijuana.

h. The Agriculture Improvement Act of 2018 or "Farm Bill" defined hemp as a cannabis sativa plant containing 0.3% or less of THC by dry weight; hemp, as defined, is legal to

cultivate and sell across state lines. Anything above the concentration of 0.3% THC by dry weight is federally illegal. In December 2025, President Trump signed Executive Order 14730, "Increasing Medical Marijuana and Cannabidiol Research," which directed appropriate authorities to take measures to reclassify marijuana from a Schedule I to a Schedule III drug. This change does not affect the federal legality of marijuana but instead allows for greater scientific research into potential medicinal uses of the compound. In Virginia, under Va. Code § 4.1-1100 and Va. Code § 18.2-248.1 marijuana is illegal to buy or sell, but adults 21 years of age or older may possess up to one (1) ounce. This statute presumes that any amount above two ounces is not for personal use.

i. CBD is not nearly as psychoactive as THC and, when taken in moderate doses with THC, it ameliorates the psychoactive effects of THC via allosteric modulation, that is, it changes the shape of the CB1 and CB2 receptors impacting the ability of THC to bind to them. CBD is legal both federally and in the Commonwealth of Virginia.

j. Delta-8-tetrahydrocannabinol occurs naturally only in very small quantities in the cannabis sativa plant; however, through chemical transformation of CBD, Δ8-tetrahydrocannabinol can be synthesized in quantities efficient for the production of intoxicating products. Delta-8-tetrahydrocannbinol is less psychoactive than traditional Δ9-tetrahydrocannibnol but is still psychoactive.

B. <u>Virginia Law</u>

a. Virginia Code Section 4.1-1100 et seq., governs the sale and possession of marijuana in the Commonwealth of Virginia.

b. Pursuant to Virginia Code Section 4.1-1100(A), adults 21 or older can legally possess up to 2 (two) ounces of marijuana in any public place or an equivalent amount of marijuana product as determined by regulation promulgated by the Board of Directors of the Virginia Cannabis Control Authority.

c. Pursuant to Virginia Code Section 4.1-1100(B), possession of over 2 (two) ounces of marijuana is subject to varying criminal penalties depending on the amount. The penalties range from misdemeanor offenses to a felony for possession of 1 (one) pound or more of marijuana.

d. Under Virginia Code Section 4.1-1600, Virginia has legalized a "Medical Cannabis Program." A practitioner as defined under Virginia law, in the course of his professional practice may issue a written certification for the use of cannabis products (as defined by Virginia law) for treatment or to alleviate the symptoms of any diagnosed condition or disease determined by the practitioner to benefit from such use.

e. Pursuant to Virginia Code 18.2-248.1, it is unlawful for any person to sell give, distribute or possess with intent to sell, give, or distribute marijuana. This same Virginia Code section provides both misdemeanor and felony penalties in relation to the illegal sale of various amounts of marijuana. Possession with intent to distribute or distribution of more than one ounce but less than five pounds is a Class Five Felony. Possession with intent to distribute or distribution of more than five pounds is a felony punishable by imprisonment of not less than five years nor more than thirty years.

C. Virginia Marijuana Licensing

a. Effective July 2020, Virginia decriminalized simple marijuana possession, and the first medical dispensary opened the following month. Recreational use laws that took effect July

2021 allowed adults to possess one ounce (28g), cultivate four plants per household and share marijuana where there was no commercial transaction. Retail sales, however, were limited to medical patients. In 2021, the Virginia Cannabis Control Authority (CCA) was created in Virginia. The CCA was to be responsible for the regulation of medical cannabis, the adult use retail market, and regulated hemp products pursuant to VA Code 4.10600 et seq. Specifically, the CCA would oversee the approval of licenses to individuals and/or entities engaged in the sale of recreational marijuana or cannabis (which terms are used interchangeably). The CCA has a Board of Directors appointed by the Governor and confirmed by the General Assembly.

b. On January 22, 2021, Virginia SB 1406 "Marijuana; legalization of simple possession, penalties," sponsored by LILLIE LOUISE LUCAS (hereinafter LOUISE LUCAS) and another senator was advanced by the state Senate Rehabilitation and Social Services Committee. This bill and its House of Delegates counterpart passed on February 5, 2021, and, following the amendment process, was signed by Governor Northam. The Senate version pressed for legalization to begin in July 2021. However, the House version delayed legislation until January 2024 (that would have included retail sales). The amended law signed by the Governor reached a compromise that legalized recreational use in July 2021, with scheduled retail sales to follow beginning in January 2024. A re-enactment clause required the Virginia legislature to re-approve the sales provision for it to take effect.[1] Following a change in leadership in the House of Delegates in 2021, this re-enactment was not taken up by the legislature in 2022. Thus, commercial sales of marijuana remained illegal.

---

[1] A "re-enactment clause" is a provision attached to a bill that requires the Virginia General Assembly to vote again to pass the legislation in order for it to take effect.

c. During the 2023 session of the General Assembly, all bills to begin recreational sales failed to pass with the split Republican run House of Delegates and the Democratic run State Senate. In 2024, following Democratics taking control of the state legislature in the 2023 elections, legislation was again introduced to begin recreational sales. Though the House and Senate passed a bill to allow recreational sales to commence on May 1, 2025, Governor Youngkin vetoed the bill on March 28, 2024. This process was repeated in 2025 with another passed bill and another veto. All of these efforts to create a retail market for marijuana involved the establishment of a licensing scheme for marijuana sales. These licenses were anticipated to be very valuable given the expected amount of revenue to be generated by marijuana sales. Though retail use was not authorized, applications could be made for a marijuana business license.

d. In the 2026 legislative session, following the 2025 election of Governor Spanberger, both houses passed companion bills to legalize retail marijuana sales, beginning in 2027, to be administered by the CCA. The Governor sent the bill back with several amendments that would have delayed the launch of retail sales from January to July 2027, and increased penalties for public consumption. When the legislature voted to reject these amendments on April 22, 2026, the Governor vetoed the original bill in May. A deal was subsequently announced in June with provisions regulating recreational marijuana sales enacted in the annual budget legislation, with sales planned to begin July 1, 2027. On that date, entities with licenses issued by the CCA can commence commercial sales of marijuana in the Commonwealth of Virginia.

<u>GENERAL ALLEGATIONS</u>

A. LOUISE LUCAS was elected to the Virginia State Senate in 1991. As a state senator, LOUISE LUCAS is currently the Chairman of the Senate Finance and Appropriations

Committee which handles the state budget, tax policy and state expenditures. Since 2020, she has been elected by the Virginia Senate as the President Pro Tempore. In this role she serves as the presiding member of the state senate in the absence of the Lieutenant Governor. LOUISE LUCAS owns a number of business entities, including Lucas Lodge, LLC, Lucas Hospitality, LLC, and The Cannabis Outlet, all located in Portsmouth, VA.

B. LOUISE LUCAS' family members include LISA LUCAS BURKE, RYAN EICHELBERGER and THERESA LUCAS-LAMB. LISA LUCAS BURKE and THERESA LUCAS-LAMB are the natural daughters of LOUISE LUCAS. RYAN EICHELBERGER is the son of THERESA LUCAS-LAMB and the grandson of LOUISE LUCAS. LISA LUCAS BURKE is an employee of Lucas Lodge and conducts business on behalf of Lucas Lodge and The Cannabis Outlet. THERESA LUCAS-LAMB previously worked as the manager of The Cannabis Outlet with her son RYAN EICHELBERGER working with her to run the day-to-day operations of the store. THERESA LUCAS-LAMB was forced out of the business by her mother in the Fall of 2024 and was replaced as manager by RYAN EICHELBERGER.

C. PRINCE ALBERT WILLIAM HUDSON, III, is a businessman who owns a number of businesses to include Agri-Carter, LLC, which advertises itself as a provider of hemp and CBD based products. He also owns Regal Industries, LLC, which does business as Exotic World, a CBD store in Danville, VA.

D. CARLTON UPTON, JR. was a business partner of LOUISE LUCAS in Virginia Freedom Life, which encompassed The Cannabis Outlet and another business, The CBD Shoppe, beginning in 2019.

E. On June 10, 2020, LOUISE LUCAS participated in certain protest activity in Portsmouth, VA. The Portsmouth Police Chief charged LOUISE LUCAS with two felony charges arising from the protests. After the filing of these charges, the Chief was placed on leave. In November 2020, the Commonwealth Attorney for Portsmouth dismissed the charges against LOUISE LUCAS. The Police Chief was fired the same day.

F. On or about November 23, 2009, LOUISE LUCAS registered Lucas Lodge, LLC, with a business address of 1120 Lakeview Dr, Portsmouth, Va. Portsmouth, VA. This business was portrayed as being a health care provider for adults with intellectual challenges.

G. On or about October 23, 2009, LOUISE LUCAS organized Lucas Hospitality, LLC, with a business address of 1214 County St. Portsmouth, VA. The intended nature of this business is unknown. The business name is affiliated with The Cannabis Outlet, which purports to sell hemp related products.

H. On or about October 1, 2018, PRINCE ALBERT WILLIAM HUDSON, III, registered Agri-Carter with a business address of 3213 Garland Ave., Richmond, VA 23222.

I. On or about February 28, 2019, CARLTON UPTON, JR., registered Virginia Freedom Life with a business address of 345 Granby Street, Norfolk, VA. The intended nature of this business is unknown but shares an address with The CBD Shoppe, which claims to sell hemp related products.

J. On June 2, 2021, THERESA LUCAS-LAMB registered Backyard Entertainment, LLC, with a business address of 1214 County St., Portsmouth, VA. The intended nature of this business is unknown.

K. Following his hiring in 2022, a senior law enforcement officer warned LOUISE LUCAS that selling marijuana was illegal and was going to get her in trouble one day. At a subsequent meeting between the senior law enforcement officer, another Virginia state legislator, and LOUISE LUCAS to discuss the various issues related to law enforcement, the senior law enforcement officer reiterated that LOUISE LUCAS needed to stop selling marijuana and asked her why, given that she was a state senator and a wealthy woman, she would engage in criminal behavior. LOUISE LUCAS did not answer this question. The legislator agreed that LOUISE LUCAS should not associate herself with selling marijuana, while it was still illegal.

L. On March 23, 2023, HUDSON registered Regal Industries, LLC, with a business address of 518 Arnett Blvd., Danville, VA. Regal Industries, LLC has a fictitious name or "doing business as" Exotic World, with the State Corporation Commission.

M. On January 31, 2023, and July 26, 2024, LOUISE LUCAS was issued violation notices from the Virginia Department of Agriculture and Consumer Services related to The Cannabis Outlet and offering non-compliant cannabis products for sale. The latter notice imposed a $66,500 fine for the violations which included THC levels above .3% in certain products.

N. On September 26, 2024, The Cannabis Outlet experienced a burglary. EICHELBERGER and LUCAS-BURKE provided the complaint to the Portsmouth Police Department and provided video of the burglary. They claimed that $450 and approximately $3,000 worth of marijuana products were missing. On October 23, 2024, the suspected marijuana products were recovered by the Portsmouth Police Department.

O. No state criminal prosecution has ever been initiated concerning the activity of The Cannabis Outlet.

## COUNT ONE
(Racketeering Conspiracy)

THE GRAND JURY CHARGES THAT:

1. The General Allegations Section is realleged and incorporated as if fully set forth herein.

### The Enterprise

2. At all times relevant to this Indictment, in the Eastern District of Virginia and elsewhere, the defendants, LOUISE LUCAS, LISA LUCAS BURKE, PRINCE ALBERT WILLIAM HUDSON, III, RYAN EICHELBERGER, THERESA LUCAS-LAMB, CARLTON UPTON, JR., and others known and unknown, were members and associates of the Lucas Enterprise, a criminal organization, which was engaged in, among other things, conspiracy to distribute and possess with intent to distribute marijuana, distribution of marijuana, possession with intent to distribute marijuana, maintaining drug involved locations, possession of firearms in furtherance of drug trafficking, conspiracy to launder money, money laundering, conspiracy to commit honest services fraud, and bribery, and which operated principally in the Eastern Virginia, Virginia.

3. The Lucas Enterprise, including its leaders, members and associates, constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. This enterprise was engaged in, and its activities affected interstate and foreign commerce.

Purposes of the Enterprise

4. The purposes of the enterprise included the following:

i. Obtaining and illegally distributing large quantities of illegal marijuana;

ii. Procuring "generational wealth" for, and enrichment of, members and associates of the enterprise;

iii. Using the proceeds from the distribution of illegal marijuana sales to obtain additional quantities of marijuana to continue and expand the enterprise's illegal marijuana business;

iv. Directing, obtaining, and influencing the provision of marijuana licenses to entities in which members and associates retained and expected to procure a financial interest.

v. Using the political influence of LOUISE LUCAS to enact legislation and regulations to financially benefit the Lucas Enterprise and to obtain recreational marijuana licenses for members and associates of the Lucas Enterprise.

Means and Methods of the Enterprise

5. The means and methods by which Lucas Enterprise members and associates of the Lucas Enterprise conducted and participated in the conduct of the affairs of the enterprise included, but were not limited to, the following:

a. Members and associates of the Lucas Enterprise obtained and illegally distributed large quantities of marijuana through, among other avenues, businesses, entities, and locations owned and operated by members and associates of the Lucas Enterprise;

b. Members and associates of the Lucas Enterprise used various business entities owned, operated, and maintained by members and associates of the Lucas Enterprise to disguise the proceeds of illegal marijuana distribution;

c. Members and associates of the Lucas Enterprise used the political influence of LOUISE LUCAS to insulate the Lucas Enterprise from state law enforcement actions;

d. In 2026, CARLTON UPTON, JR. worked with LOUISE LUCAS to use her political position to obtain a recreational marijuana license for CARLTON UPTON, JR., with the understanding that the proceeds of marijuana sales under the license would be shared with LOUISE LUCAS to support the Lucas Enterprise;

e. Members and associates of the Lucas Enterprise used the political influence of LOUISE LUCAS to enact legislation and obtain licenses that would financially benefit the Lucas Enterprise and to further the goal of wealth accumulation for the Lucas Enterprise; and

f. LOUISE LUCAS used her political position in the Virginia state senate to insulate the Lucas Enterprise from criminal scrutiny, to further the goal of wealth accumulation for the Lucas Enterprise and to seek legislation benefiting the Lucas Enterprise.

## Roles of the Defendants

6. The roles of the defendants in the enterprise included, but were not limited to, the following:

a. The defendant, LOUISE LUCAS, was the leader of the enterprise. LOUISE LUCAS approved and directed criminal activities and other activities in furtherance of the enterprise's affairs, arranged for the acquisition and distribution of marijuana, supervised the laundering of marijuana proceeds, used her political influence to attempt to influence Virginia

legislation for the benefit of herself and family and maintained a premise for the distribution of marijuana.

b. The defendant LISA LUCAS-BURKE is the daughter of LOUISE LUCAS and planned and participated in criminal activities and other activities in furtherance of the enterprise's affairs and attended meetings.

c. The defendant, PRINCE ALBERT WILLIAM HUDSON, III, obtained marijuana for members of the Lucas Enterprise, which would then be sold with the proceeds benefiting the Lucas Enterprise. HUDSON was a regular supplier of The Cannabis Outlet and derived a significant majority of his business and revenue from the sales of marijuana by The Cannabis Outlet.

d. The defendant RYAN EICHELBERGER, is the son of THERESA LUCAS-LAMB and acquired marijuana for distribution, supervised the distribution of marijuana and managed The Cannabis Outlet for the Lucas Enterprise.

e. The defendant, THERESA LUCAS-LAMB, is the daughter of LOUISE LUCAS and acquired marijuana for distribution, supervised the distribution of marijuana and managed The Cannabis Outlet for the Lucas Enterprise.

f. The defendant, CARLTON UPTON, JR., was an early business partner in Virginia Freedom Life with LOUISE LUCAS. Virginia Freedom Life encompassed The Cannabis Outlet and The CBD Shoppe. UPTON also managed The CBD Shoppe and worked with LOUISE LUCAS to obtain a recreational marijuana license, the proceeds of which would benefit the Lucas Enterprise.

The Racketeering Conspiracy

7. Beginning on a date unknown, but starting no later than 2019, and continuing to the return of this Indictment, in the Eastern District of Virginia and elsewhere, the defendants,

LOUISE LUCAS,

LISA LUCAS BURKE,

PRINCE ALBERT WILLIAM HUDSON, III,

RYAN EICHELBERGER,

THERESA LUCAS-LAMB,

CARLTON UPTON, JR.,

and others known and unknown, each being a person employed by and associated with the Lucas Enterprise, an enterprise, engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly combine, conspire, confederate, and agree with one another to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Lucas Enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Section 1961(1) and (5), which pattern of racketeering activity consisted of:

a. multiple acts involving bribery, chargeable under Va. Code Ann §§ 18.2-447, 18.2-18, 18.2-22 and 18.2-26;

b. multiple offenses involving trafficking of controlled substances, in violation of 21 U.S.C. §§ 841, 846, and 856;

c. multiple acts indictable under 18 U.S.C. § 1343, 1346 (relating to honest services wire fraud); and

d. multiple acts indictable under 18 U.S.C. § 1956 (relating to the laundering of monetary instruments).

8. It was further a part of the conspiracy that each defendant knowingly agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

Overt Acts

9. In furtherance of the conspiracy and to achieve the object and purposes of the conspiracy, the defendants and others known and unknown committed and caused to be committed overt acts in the Eastern District of Virginia, including but not limited to the following:

1. On or about March 25, 2019, Unindicted Co-conspirator #1 (UCC #1) registered Hair for Dayzzzz, LLC with a business address of 1391 Watson St, Portsmouth, VA. The exact nature of this business is unknown.

2. In or about 2021 LOUISE LUCAS and LISA LUCAS-BURKE opened The Cannabis Outlet in Portsmouth, VA.

3. From on or about June 21, 2021, to March 9, 2023, Virginia Freedom Life, LLC listed "The CBD Shoppe" as a fictitious name or "doing business as" as listed with the Virginia State Corporation Commission.

4. On or about or between June 21, 2021, and March 9, 2023, Virginia Freedom Life, LLC listed The Cannabis Outlet as a fictitious name or "doing business as" with the Virginia State Corporation Commission rules.

5. On January 24, 2022, LOUISE LUCAS posted on social media that "I'm a 78 year grandma who legalized pot and now has her own cannibis (sic) store. And I'm the last thing standing between The GOP and total control of Virginia. That's worth an RT!"

6. On or about February 1, 2022, LOUISE LUCAS listed herself as President/CEO of Virginia Freedom Life on the Virginia Conflict of Interest and Ethics Advisory General Assembly Statement of Economic Interests form.

7. In early 2022, Indicted Co-conspirator #1 (ICC #1) contributed fifteen thousand dollars ($15,000.00) to the 420ish Unity Festival, which despite its name, was described as a regional music event, and which was partly organized by LOUISE LUCAS. The receipt was made out to "Freedom is Dope" which ICC #1 used as a business name.


RECEIPT DATE 3/14/22 No. 693801
RECEIVED FROM [redacted] $15,000.00
Freedom is Dope DOLLARS
FOR RENT
FOR 420ish Festival Sponsorship (Silver)
#01001066
ACCOUNT
PAYMENT 15000
BAL. DUE Ø
CASH
CHECK
MONEY ORDER
CREDIT CARD
FROM TO
BY Pickup by [redacted]
3-11

8. On or about April 19, 2022, ICC #1 met with LOUISE LUCAS, another individual, LISA LUCAS-BURKE and THERESA LUCAS-LAMB at LOUISE LUCAS' office at 1214 County St. Portsmouth, VA.

9. On or about April 19, 2022, LOUISE LUCAS asked ICC #1 if they were a member of law enforcement before purchasing between three and five pounds of marijuana from ICC #1.

10. On or about April 19, 2022, LISA LUCAS-BURKE, paid ICC #1 (Freedom is Dope) $6,600.00 via check from Virginia Freedom Life, for the marijuana.


VA FREEDOM LIFE LLC
1214 COUNTY STREET
PORTSMOUTH, VA 23704
226
211
april 19, 2022
Freedom is Dope $ 6,600.00
Six Thousand, Six Hundred & 00/100
Fulton Bank
Lucas Hospitality Supplies/Inventory
Lisa L. Lucas-Burke

11. The $6,600.00 check drawn on the Virginia Freedom Life, LLC account, was returned for insufficient funds.

12. On or about June 8, 2022, LOUISE LUCAS, wrote a check for $6,600.00 to ICC #1 (Freedom is Dope from a Backyard Entertainment, LLC account.




13. On or about or between June 2022 and July 2022, ICC #1 delivered between three and five pounds of marijuana to The Cannabis Outlet and was paid between $3,500.00 and $4,000.00 in cash by LOUISE LUCAS.

14. On or about August 17, 2022, Mama's Chicken LLC, was organized as a Delaware business entity by Unindicted Co-conspirator #2 (UCC #2).

15. In or about August 2022, UCC #2 transmitted in interstate commerce funds to the state of Delaware to organize Mama's Chicken, LLC.

16. On or about August 22, 2022, LOUISE LUCAS contracted to purchase Mama's Chicken, LLC. for $1,050,000.00.

17. In or about August 2022, LOUISE LUCAS paid UCC #2 $750,000.00 for a 100% stake in Mama's Chicken, LLC, which was the shell holding company for which UCC #2 and LOUISE LUCAS expected to obtain a Virginia recreational marijuana license. The agreement stipulated that UCC #2 would refund $525,000 if he had not obtained a license by Dec. 31, 2025. Beginning in or about October 2022, LOUISE LUCAS began pressing UCC #2 to return to her the $750,000.00.

18. Between in or about Fall 2022 to early 2023, ICC #2 sold The Cannabis Outlet multi-pound quantities of marijuana totaling approximately 100 pounds, for $100,000-$150,000 which LOUISE LUCAS, through THERESA LUCAS-LAMB, paid for with $52,000.00 in checks and the remainder in cash.

19. On or about October 3, 2022, LOUISE LUCAS sent two text messages to ICC #2 concerning a meeting at the "store".


From: +17573282966 Louise Lucas
To: [redacted]
Good morning [redacted], this is to confirm the time for our meeting at the store today. I am so excited and looking forward to seeing you

From: +17573282966 Louise Lucas
To: [redacted]
[redacted] we (The Lucas Ladies)love doing business with you

20. On or about October 3, 2022, ICC #2 provided LOUISE LUCAS two itemized invoices, shown in the photograph, for marijuana provided to the Cannabis Outlet.



21. On or about October 13, 2022, THERESA LUCAS-LAMB sent text messages to ICC #2 concerning payment for marijuana supplies.

From: +17573282965 Teresa Store
To: [redacted]

Good afternoon, my mom stated that you would be ok with a payment of 10. I'll be here until about 5pm today but I'll be in and out, what time can you get here today, plus, I'll need more flower. I'm trying to get things in order so I can pay you sooner. I'm also doing reverse inventory for the things that are selling very slowly.

From: +17573282965 Teresa Store
To: [redacted]

Also, you never did give me more additional Voo Doo but you still have it on the list.

22. On or about October 29, 2022, ICC #2 sent a text message to THERESA LUCAS-LAMB discussing marijuana distribution strategies.

From: [redacted] (owner)

Recommend not packaging or selling half-ounces (14) or ounces (28) until you can keep 1/8ths (3.5) and quads (7) of everything on the board AND do them well.

You lose money every time you sell anything over an eighth. It'll take a team just to keep eighths on the board. If you can't keep up with eighths and quads then drop quads. It's all selling either way. Use the extra profit to get better/more help

When the time is right bring in some half ounces. Then ounces.

23. On or about October 29, 2022, THERESA LUCAS-LAMB sent a text message to ICC #2noting she needed more flower.

From: +17573282965 Teresa Store
To: [redacted]

Good morning, I'm going to need more flower.

24. HUDSON placed a photograph of himself with UPTON and LOUISE LUCAS on his Facebook page dated January 19, 2023. He also posted photographs of himself inside of what appear to be large marijuana grows.

25. On or about February 1, 2023, LOUISE LUCAS listed herself as President/CEO of Virginia Freedom Life on the Virginia Conflict of Interest and Ethics Advisory General Assembly Statement of Economic Interests form.

26. On or about March 21, 2023, LOUISE LUCAS listed the name The Cannabis Outlet as a fictitious name or "doing business as" under Lucas Hospitality, LLC.

27. During the month of December 2023, The Cannabis Outlet made payments of more than $21,000 to UCC #1.

28. During the month of January 2024, The Cannabis Outlet made payments of more than $26,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

29. During the month of February 2024, The Cannabis Outlet made payments of more than $29,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

30. During the month of March 2024, The Cannabis Outlet made payments of more than $129,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

31. During the month of April 2024, The Cannabis Outlet made payments of more than $132,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

32. During the month of May 2024, The Cannabis Outlet made payments of more than $125,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

33. During the month of June 2024, The Cannabis Outlet made payments of more than $123,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

34. During the month of July 2024, The Cannabis Outlet made payments of more than $79,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

35. During the month of August 2024, The Cannabis Outlet made payments of more than $91,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

36. During the month of September 2024, The Cannabis Outlet made payments of more than $67,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

37. On or about October 4, 2024, a controlled purchase of marijuana was made by law enforcement from The Cannabis Outlet.

38. On or about October 18, 2024, a controlled purchase of marijuana was made by law enforcement from The Cannabis Outlet.

39. During the month of October 2024, The Cannabis Outlet made payments of more than $74,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

40. During the month of October 2024, The Cannabis Outlet made payments of more than $18,600 to UCC #1.

41. On or about November 8, 2024, a controlled purchase of marijuana was made by law enforcement from The Cannabis Outlet.

42. During the month of November 2024, The Cannabis Outlet made payments of more than $51,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

43. During the month of November 2024, The Cannabis Outlet made payments of more than $58,000 to UCC #1.

44. During the month of December 2024, The Cannabis Outlet made payments of more than $40,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

45. On or about January 3, 2025, UCC #1 registered High-In-Wellness as a business with an address of 1112 Pickett Road, Norfolk, VA 23502. The purported nature of this business is unknown.

46. During the month of January 2025, The Cannabis Outlet made payments of more than $36,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

47. During the month of January 2025, The Cannabis Outlet made payments of more than $47.700 to UCC #1.

48. During the month of February 2025, The Cannabis Outlet made payments of more than $55,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

49. During the month of February 2025, The Cannabis Outlet made payments of more than $22,900 to UCC #1.

50. During the month of March 2025, The Cannabis Outlet made payments of more than $38,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

51. During the month of March 2025, The Cannabis Outlet made payments of more than $53,800 to UCC #1.

52. During the month of April 2025, The Cannabis Outlet made payments of more than $54,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

53. During the month of April 2025, The Cannabis Outlet made payments of more than $45,100 to UCC #1.

54. On or about May 5, 2025, an undercover law enforcement agent (UC) purchased 10.2 grams of marijuana from The CBD Shoppe.

55. During the month of May 2025, The Cannabis Outlet made payments of more than $43,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

56. During the month of May 2025, The Cannabis Outlet made payments of more than $47,200 to UCC #1.

57. During the month of June 2025, The Cannabis Outlet made payments of more than $77,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

58. During the month of June 2025, The Cannabis Outlet made payments of more than $3,400 to UCC #1.

59. During the month of July 2025, The Cannabis Outlet made payments of more than $73,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

60. During the month of July 2025, The Cannabis Outlet made payments of more than $62,600 to UCC #1.

61. On or about July 14, 2025, THERESA LUCAS-LAMB received a payment of $2,500.00 from the Agri-Carter business account controlled by HUDSON.

62. On or about August 1, 2025, THERESA LUCAS-LAMB received a payment of $2,500.00 from the Agri-Carter business account controlled by HUDSON.

63. On or about August 13, 2025, Norfolk Police seized seven pounds of marijuana that had been shipped to High-In-Wellness at 1112 Pickett Road, Norfolk, VA 23502.

64. On or about August 18, 2025, THERESA LUCAS-LAMB received a payment of $2,500.00 from the Agri-Carter business account controlled by HUDSON.

65. During the month of August 2025, The Cannabis Outlet made payments of more than $33,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

66. During the month of August 2025, The Cannabis Outlet made payments of more than $34,800 to UCC #1.

67. During the month of September 2025, The Cannabis Outlet made payments of more than $81,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

68. On or about September 9, 2025, THERESA LUCAS-LAMB received a payment of $2,500.00 from the Agri-Carter business account controlled by HUDSON.

69. On or about September 19, 2025, THERESA LUCAS-LAMB received a payment of $3,900.00 from the Agri-Carter business account controlled by HUDSON.

70. On or about October 6, 2025, THERESA LUCAS-LAMB received a payment of $2,500.00 from the Agri-Carter business account controlled by HUDSON.

71. On or about October 20, 2025, THERESA LUCAS-LAMB received a payment of $2,500.00 from the Agri-Carter business account controlled by HUDSON.

72. On or about October 23, 2025, a controlled purchase of one half (½) ounce of marijuana was made by law enforcement from Tthe Cannabis Outlet.

73. On or about October 31, 2025, a controlled purchase of one ounce of marijuana was made by law enforcement from Tthe Cannabis Outlet. During the transaction, EICHELBERGER informed the undercover officer that an additional load of "product" was due on November 3, 2025.

74. During the month of October 2025, The Cannabis Outlet made payments of more than $27,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

75. On or about November 3, 2025, PRINCE ALBERT WILLIAMS HUDSON, III, delivered multiple large boxes to Tthe Cannabis Outlet.

76. On or about November 4, 2025, THERESA LUCAS-LAMB received a payment of $2,500.00 from the Agri-Carter business account controlled by HUDSON.

77. On or about November 15, 2025, LOUISE LUCAS sent UCC #2 a text message concerning her $750,000.00 August 2022 payment that she had tried to recover.

Sat, Nov 15 at 11:10 AM

[redacted] I received a message from you after the election wherein you stated that you have the answer. And, you know I will be carrying the legislation as the Chief Co-patron. Yes, we can make a lot of money but, before we start down that road again; how about we begin with you sending at least a good faith payment of the money you owe me with arrangements for the balance. Then we can talk about future business plans.

L. Louise Lucas

78. On or about November 24, 2025, THERESA LUCAS-LAMB received a payment of $2,500.00 from the Agri-Carter business account controlled by HUDSON.

79. On or about November 26, 2025, PRINCE ALBERT WILLIAM HUDSON, III, delivered two large boxes to The Cannabis Outlet.

80. During the month of November 2025, The Cannabis Outlet made payments of more than $35,000 to HUDSON, which were deposited into his Agri-Carter LLC bank account at Fulton Bank.

81. On or about December 9, 2025, law enforcement made a controlled purchase of one ounce of marijuana from High-In-Wellness.

82. On or about December 9, 2025, law enforcement made a controlled purchase of one ounce of marijuana from The CBD Shoppe.

83. On or about December 12, 2025, Herbal Outlet, LLC was organized with a business address of 1214 County St. Portsmouth, VA.

84. On or about January 13, 2026, EICHELBERGER sent a text message to Tameka Johnson, stating "Morning Tameka! Can you pull up Friday with some flower & I'll have a list of stuff for you to try & get for next time."

85. On or about February 14, 2026, EICHELBERGER sent a text message to Johnson, "Also can you get the COAs for the flower and other products?", to which Johnson responded "Okay."

86. On or about February 19, 2026, EICHELBERGER sent a text message to Johnson, "How much for just the Tyson and Extract?" To which Johnson responded "Tyson-1100."

87. On or about February 19, 2026, Johnson sent a text message to EICHELBERGER, "I'm giving U some good prices now." "How much flower do you need?"

88. On or about April 11, 2026, EICHELBERGER sent a text message to Johnson, "What up Tameka. You got a few P's you can pullup in the morning?"

89. On or about April 11, 2026, Johnson sent a text message to EICHELBERGER, "How many", to which EICHELBERGER responded, "4 or 5".

90. On or about January 30, 2026, UCC #2 met with LOUISE LUCAS, per her request, at her legislative office at the Capitol complex in Richmond, VA where UCC #2 provided LOUISE LUCAS with a "partial repayment" of the money LOUISE LUCAS paid for an interest in Mama's Chicken, LLC. The $100,000 was provided to UCC #2 by the FBI.

91. During the meeting with UCC #2 on January 30, 2026, LUCAS telephoned the president of the Virginia Cannabis Association and Vice Chair of the Virginia Beach Cannabis Task Force and informed him that she and UCC #2 were "back in the same tent again."

92. On or about January 30, 2026, LOUISE LUCAS called UCC #2 and asked for "samples" of marijuana flowers she could try out during their scheduled meeting on January 31, 2026.

93. On or about January 31, 2026, LOUISE LUCAS and UCC #2 met at her legislative office at 1214 County Street, Portsmouth, VA. During the meeting LOUISE LUCAS called LISA LUCAS-BURKE and EICHELBERGER for a group conversation during which they discussed their sources of supply for marijuana. When asked by UCC #2 whether The Cannabis Outlet was receiving hemp, LUCAS-BURKE and EICHELBERGER both responded "[i]t's not hemp, it's THC."

94. On or about January 31, 2026, following the conclusion of the group conversation, LOUISE LUCAS and UCC #2 continued discussing marijuana and marijuana licensing as a way for LOUISE LUCAS to "get generational wealth and this is my last chance."

95. On or about January 31, 2026, LOUISE LUCAS and UCC #1 met at The Cannabis Outlet.

96. On or about February 3, 2026, UCC #1 arrived at The Cannabis Outlet and took a large bag from his vehicle and took it inside the business.

97. On or about February 5, 2026, law enforcement made a controlled purchase of 69.5 grams of marijuana from The CBD Shoppe.

98. On or about February 5, 2026, law enforcement made a controlled purchase of 116 grams of marijuana from High-In-Wellness.

99. On or about February 9, 2026, LOUISE LUCAS called UCC #2 and discussed the language surrounding the recreational marijuana legislation pending in the Virginia General Assembly and the possibility of UCC #2 receiving a license and sharing the proceeds with her because "this is our last chance at generational wealth . . .. I've got too old to not be greedy."

100. On or about February 11, 2026, law enforcement observed UCC #2 dispose of a white trash bag in a dumpster. The trash bag was retrieved by law enforcement and found to contain 19 packaging bags with the odor of marijuana.

101. On or about March 7, 2026, LOUISE LUCAS called EICHELBERGER and discussed Tameka Johnson as a "middleman" for marijuana sources of supply.

102. On or about March 9, 2026, LOUISE LUCAS telephoned another Virginia legislator and informed them that she needed to get the marijuana license because "I got to get the license and I got to get the money rolling in because I want -- I want to make generation, create some generational wealth. . . . I need to be covered under his (UPTON's) um, hemp license." UPTON and the license were discussed in prior conversations between LOUISE LUCAS and the Virginia legislator.

103. On or about March 11, 2026, LOUISE LUCAS was involved in a telephone conference with a Virginia legislator and LISA LUCAS-BURKE. The call concerned the 420ish Unity Festival and LOUISE LUCAS stated "The whole police department protected us." The Virginia legislator responded that the cannabis legislation would make sure "everything is

on the up and up" to which LOUSIE LUCAS responded " [a]nd make it legal because I did, when I did it, it was obviously illegal."

104. On or about March 11, 2026, LOUISE LUCAS was involved in a telephone conference with two Virginia legislators and LISA LUCAS-BURKE concerning recreational marijuana licenses. During the call LOUISE LUCAS stated, "we trying to disqualify somebody [UCC #2] until he pays me back my money."

105. On or about March 17, 2026, UCC #2 arrived at The Cannabis Outlet and entered the business with a duffle bag.

106. On or about March 27, 2026, LISA LUCAS-BURKE informed LOUISE LUCAS that HUDSON was coming with the "stuff".

107. On or about March 27, 2026, HUDSON visited The Cannabis Outlet and delivered six large boxes. HUDSON then left with a large red duffle bag.



108. On or about March 31, 2026, UPTON met with LOUISE LUCAS at her office located at 1214 County Street, Portsmouth, VA. Prior to the meeting, UPTON telephoned LOUISE LUCAS and during the conversation stated, "I only got five licenses, but you know what I mean, you first, so I need to talk to you like before I make any decisions that affect you."

109. On or about April 23, 2026, LOUISE LUCAS telephoned a member of the CCA who asked if there was anything they could do for her. LOUISE LUCAS responded that she needed "to invest in something that -- that can help me generate some uh, generational wealth for my family." When the board member suggested cannabis licenses, LOUISE LUCAS responded

that "got a couple of bad apples who are going to be applying for a license who do not get them."

110. On or about April 28, 2026, LOUISE LUCAS telephoned EICHELBERGER and asked where he thought he would be getting "the flower". EICHELBERGER responded, "(UCC #2) and -- and Prince and Tameka."

111. On or about May 6, 2026, a federal search warrant was executed at The Cannabis Outlet where marijuana was recovered.

112. On or about May 6, 2026, a federal search warrant was executed at The CBD Shoppe where marijuana was recovered.

113. On or about May 6, 2026, a federal search warrant was executed at Exotic World in Danville, VA, a business owned by HUDSON, where marijuana was recovered.

114. On or about July 10, 2026, law enforcement made a controlled purchase of two separate strains titled "Sativa" and "Indica" from the Cannabis Outlet. Both tested positive for marijuana.

(In violation of Title 18, United States Code, Section 1962(d)).

COUNT TWO

(Conspiracy to Distribute and Possess with Intent to Distribute Marijuana)

THE GRAND JURY FURTHER CHARGES THAT:

1. The factual allegations in paragraphs 1 through 9 of Count One of this Indictment are realleged and incorporated as if fully set out herein.

2. On or about or between 2020 and 2026, in the Eastern District of Virginia and elsewhere, the defendants, LOUISE LUCAS, LISA LUCAS BURKE, PRINCE ALBERT WILLIAM HUDSON, III, RYAN EICHELBERGER, THERESA LUCAS-LAMB, CARLTON UPTON, JR., TAMEKA JOHNSON and others known and unknown, did unlawfully, knowingly and intentionally combine, conspire, confederate and agree together with other persons known and unknown to the grand jury to commit the following offenses against the United States:

3. Distribute 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B).

4. Possess with intent to distribute 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B).

(All in violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(B)).

COUNT THREE
(Conspiracy to Launder Money)

THE GRAND JURY FURTHER CHARGES THAT:

1. The factual allegations in paragraphs 1 through 9 of Count One of this Indictment are realleged and incorporated as if fully set out herein.

2. Beginning in or about 2020 through 2026, in the Eastern District of Virginia and elsewhere, LOUISE LUCAS, LISA LUCAS BURKE, PRINCE ALBERT WILLIAM HUDSON, III, RYAN EICHELBERGER, THERESA LUCAS-LAMB, CARLTON UPTON, JR., TAMEKA JOHNSON the defendants herein, along with others known and unknown to the Grand Jury did knowingly, willfully, and unlawfully combine, conspire, confederate and agree with each other and other persons, both known and unknown, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

a. Laundering of monetary instruments, that is, to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846, as described in Count Two of this Indictment, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form

of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b. To knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846, as described in Count Two of this Indictment, with the intent to promote the carrying on of specified unlawful activity, that is conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

(In violation of Title 18, United States Code, Section 1956(h)).

COUNT FOUR
(Conspiracy to Commit Honest Services Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

1. The factual allegations in paragraphs 1 through 9 of Count One of this Indictment are realleged and incorporated as if fully set out herein .

2. From in or about 2022 through in or about 2026, in the Eastern District of Virginia and elsewhere, defendants LOUISE LUCAS, LISA LUCAS BURKE and CARLTON UPTON, JR., knowingly and intentionally conspired with each other and with other persons known and unknown to devise and intend to devise a scheme and artifice to defraud and deprive the citizens of the Commonwealth of Virginia of their intangible right to the honest services of LOUISE LUCAS, through bribery, and for the purpose of executing such scheme, did knowingly transmit, or caused to be transmitted, any writing, signal, or sound by means of a wire communication in interstate or foreign commerce, in violation of Title 18, United States Code, Section 1343 and 1346.

Purpose

3. The conspiracy and scheme and artifice had multiple purposes. One purpose of the conspiracy and the scheme and artifice was for defendant LOUISE LUCAS to use her official position as a state senator of the Commonwealth of Virginia to enrich herself by soliciting and/or accepting payments, gifts, and other things of value from others (including conspirators). Another purpose of the conspiracy and scheme and artifice was for LOUISE LUCAS to perform official actions, including certain specific official actions and other official actions on an as-needed basis to benefit UCC #2, UPTON and others.

Manner and Means

4. The manner and means by which the conspirators would and did carry out the conspiracy included, but were not limited to, the following:

a. LOUISE LUCAS was elected to serve as a state senator by the citizens of Virginia. She was a vocal proponent of legislation authorizing and establishing a retail market for marijuana.

b. In order to benefit herself and The Lucas Enterprise, LOUISE LUCAS sought opportunities to invest in and benefit from anticipated recreational marijuana licensing.

c. LOUISE LUCAS provided money to UCC #2 and obtained an ownership interest in an entity created by UCC#2 in order to financially benefit from anticipated marijuana licensing and sales in exchange for using her political influence to take official actions to steer a marijuana license to UCC#2 and/or entities UCC#2 controlled and/or fronted.

d. LOUISE LUCAS did not report the interest obtained in this entity on her required Statement of Economic Interests forms.

e. LOUISE LUCAS demanded and accepted a partial re-payment of her invested funds ($100,000) from UCC#2 in exchange for continuing to work to direct a license to UCC#2.

5. LOUISE LUCAS engaged in official acts related to marijuana legislation on behalf of UCC#2, UPTON and others on an as-needed basis.

6. In furtherance of this scheme, UCC#2, LOUISE LUCAS and other conspirators engaged in and/or agreed to engage in wire transmissions in interstate commerce.

(In violation of Title 18, United States Code, Sections 1349, 1343 and 1346).

COUNT FIVE
(Maintaining a Drug Involved Premises)

THE GRAND JURY FURTHER CHARGES THAT:

On or about or between 2020 and 2026, in the Eastern District of Virginia, defendants LOUISE LUCAS, LISA LUCAS BURKE, RYAN EICHELBERGER, and THERESA LUCAS-LAMB, did unlawfully and knowingly manage, and control real property and improvements located at 1215 High Street, Portsmouth, VA 23704, as an owner and occupant, and did knowingly and intentionally make available for use said place for the purpose of unlawfully manufacturing, storing, distributing, and using a controlled substance.

(In violation of Title 21, United States Code, Section 856(a)(2)).

COUNT SIX
(Maintaining a Drug Involved Premises)

THE GRAND JURY FURTHER CHARGES THAT:

On or about or between 2020 and 2026, in the Eastern District of Virginia, defendants CARLTON UPTON, JR. and TAMEKA JOHNSON, did unlawfully and knowingly manage, and control real property and improvements located at 345 Granby Street, Suite A, Norfolk, VA 23510, as an owner and occupant, and did knowingly and intentionally make available for use said place for the purpose of unlawfully manufacturing, storing, distributing, and using a controlled substance.

(All in violation of Title 21, United States Code, Section 856(a)(2)).

COUNT SEVEN
(Possess a Firearm in Furtherance of a Drug Trafficking Crime)

THE GRAND JURY FURTHER CHARGES THAT:

On or about May 6, 2026, in the Eastern District of Virginia, the defendant, RYAN EICHELBERGER, aided and abetted by others known and unknown, did knowingly possess a firearm in furtherance of, a drug trafficking crime for which they may be prosecuted in a court of the United States, specifically, Conspiracy to Possess with Intent to Distribute and Distribute Marijuana, the offense set forth in Count Two of this Indictment, the descriptions of which are hereby incorporated by reference as though fully set forth herein.

(In violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2).

COUNT EIGHT
(Wire Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

1. The United States Small Business Administration (SBA) is an executive-branch agency of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

2. As part of this effort, the SBA enables and provides for loans through banks, credit unions and other lenders. These loans have government-backed guarantees. In addition to traditional SBA funding programs, The CARES Act, which was signed into law in March 2020, established several new temporary programs and provided for the expansion of others to address the COVID-19 outbreak.

3. Another related response to the COVID-19 outbreak was an expansion of an existing disaster-related program - the Economic Injury Disaster Loan (EIDL) - to provide for loan assistance (including $10,000 advances) for small businesses and other eligible entities for loans up to $2 million. The EIDL proceeds can be used to pay fixed debts, payroll, accounts payable and other bills that could have been paid had the disaster not occurred; however, such loan proceeds are not intended to replace lost sales or profits or for expansion of a business.

4. Unlike certain other types of SBA-guaranteed loans, EIDL funds are issued directly from the United States Treasury and applicants apply through the SBA via an online portal and application. The EIDL application process, which also uses certain outside contractors for system support, collects information concerning the business and the business owner, including:

information as to the gross revenues for the business prior to January 31, 2020; the cost of goods sold; and information as to any criminal history of the business owner. Applicants electronically certify that the information provided is accurate and are warned that any false statement or misrepresentation to the SBA or any misapplication of loan proceeds may result in sanctions, including criminal penalties.

First Virginia Freedom Life EIDL Application

5. On or about April 10, 2020, CARLTON UPTON, JR., the defendant herein, electronically applied for an EIDL using the company name of Virginia Freedom Life. UPTON claimed that Virginia Freedom Life was located at 6721 Hampton Parkway, Suffolk, Virginia.

6. On or about April 10, 2020, UPTON responded no to the question "have you ever been convicted, plead (sic) guilty, plead (sic) nolo contendere, been placed on pretrial diversion, or been placed on any form of parole or probation . . .". This statement was false given UPTON's four prior felony convictions.

7. UPTON listed gross revenue for Virginia Freedom Life of $58,463 and $35,000 costs of goods. UPTON was funded a loan in the amount of $11,800.

Second Virginia Freedom Life EIDL Application

8. On or about July 13, 2020, UPTON, the defendant herein, electronically applied for an EIDL using the company name of Virginia Freedom Life.

9. UPTON listed gross revenue for Virginia Freedom Life of $450,000 and $300,000 costs of goods with rental income of $12,000. UPTON was declined for a loan.

THE SCHEME AND ARTIFICE

10. From on or about at least April 2020, to in or about at least September 2020, in the Eastern District of Virginia and elsewhere, CARLTON UPTON, JR., the defendant herein, devised and intended to devise a scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, promises and omissions.

11. It was a part of the scheme and artifice that the defendant sought to fraudulently obtain disaster-related benefits in the form of SBA-sponsored Economic Injury Disaster (EIDL) loans.

12. It was further a part of the scheme and artifice that the defendant submitted applications for loans under the EIDL program that contained false statements, misrepresentations and omissions related to the defendant's income, claimed business entities and his prior criminal record.

13. It was further a part of the scheme and artifice that the defendant falsely attested on the aforementioned loan applications that the information presented was true and accurate.

14. It was further a part of the scheme and artifice that the defendant received and obtained approximately $11,800 in EIDL proceeds.

15. It was further a part of the scheme and artifice that the defendant caused the transmission of information and funds by wire between the Eastern District of Virginia and locations outside of the Commonwealth of Virginia.

WIRING IN FURTHERANCE OF THE SCHEME

On or about April 10, 2020, CARLTON UPTON, JR., the defendant herein, having devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by

means of materially false, fraudulent and fictitious pretenses, representations and promises, as described in Paragraphs 5-9 above and incorporated herein by reference, and, for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, in the Eastern District of Virginia and elsewhere, did knowingly and willfully transmit and cause to be transmitted by means of wire communication in interstate commerce, the following certain signs, signals, and sounds: to wit, an Economic Injury Disaster Loan (EIDL) application to the SBA for Virginia Freedom Life resulting in funding that contained false statements and misrepresentations and omissions related to his business entity, employment, income and background. to/from/through a location within the Eastern District of Virginia to/from/through a location outside of the Commonwealth of Virginia.

(In violation of Title 18, United States Code, Sections 1343 and 2).

## FORFEITURE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

1. The defendants, if convicted of the violation alleged in Count 1 of this indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2:

   a. Any interest the defendant acquired or maintained in violation of Title 18, United States Code, Section 1962;

   b. Any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendant has established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

   c. Any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of Title 18, United States Code, Section 1962.

2. The defendants, if convicted of the violation alleged in Count 3 of this indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, involved in the violation, or any property traceable to that property.

3. The defendants, if convicted of any of the violations alleged in Counts 2, 5, 6, and 7 of this indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2:

a. Any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of the violation; and

b. Any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the violation.

4. The defendants, if convicted of any of the violations alleged in this indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any firearm or ammunition involved in or used in the violation.

5. The defendants, if convicted of the violation alleged in Count 4 of this indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

6. If any property that is subject to forfeiture above is not available, it is the intention of the United States to seek an order forfeiting substitute assets pursuant to Title 21, United States Code, Section 853(p) and Federal Rule of Criminal Procedure 32.2(e).

7. The assets subject to forfeiture include, but are not limited to:

A. Real property and improvements located at 1214 County Street, Portsmouth, Virginia 23704;

B. Real property and improvements located at 1215 High Street, Portsmouth, Virginia 23704;

C. Real property and improvements located at 530 Arnett Boulevard, Danville, Virginia 24540;

D. Real property and improvements located at 516-518 & 520 Arnett Boulevard, Danville, Virginia 24540;

E. Real property and improvements located at 801 Freedom Avenue, Portsmouth, Virginia 23701;

F. Funds on deposit in Southern Bank account # 2062104012.

(In accordance with Title 21, United States Code, Section 853; Title 18, United States Code, Sections 924(d)(1), 981(a)(1)(C), 982(a)(1), and 1963(a); and Title 28, United States Code, Section 2461(c)).

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

UNITED STATES v. LILLIE LOUISE LUCAS, et. al. Criminal No. 4:26-CR-75

A TRUE BILL:
REDACTED COPY

FOREPERSON

TODD W. BLANCHE
ATTORNEY GENERAL

THEOPHANI K. STAMOS
FIRST ASSISTANT UNITED STATES ATTORNEY

By:
Eric M. Hurt
Brian J. Samuels
Assistant United States Attorneys
Attorneys for the United States
United States Attorney's Office
Eastern District of Virginia
One City Center, Suite 200
11815 Fountain Way
Newport News, Virginia 23606
Phone: (757) 591-4000
Fax: (757) 591-0866